## HAMPTON, et al v. CITY OF JACKSONVILLE.
No. 59-3374-E.

Circuit Court, Duval County.

November 24, 1959.

---

William M. Madison, Jacksonville, for plaintiffs.

Ernest D. Jackson, Jacksonville, for defendant.

JOHN M. McNATT, Circuit Judge.

Alleging themselves to be taxpaying citizens of the City of Jacksonville, plaintiffs seek a declaratory decree respecting, and consequent injunction prohibiting, the sale by the city of municipally owned properties known as the Brentwood golf course and the Hyde Park golf course. Neither the right of the plaintiffs to maintain the action nor the jurisdiction of the court in the premises is questioned.

By agreement of the parties the case was expedited and was tried on November 13th and 14th, 1959. At the beginning of the trial, the parties agreed that so-called "civil rights" were not involved, and the court sustained the defendant's motion to strike the second paragraph of paragraph 10 of the complaint, and denied the remainder of its motion.

*Findings*

On the pleadings, the evidence submitted, and the admissions of the parties in open court, the material facts are —

(a) The Brentwood golf course is located within the city limits at Golfair Boulevard and Moncrief Road. It consists of approximately 129.84 acres of land purchased by the city, and is now a complete 18 hole golf course, with furnished clubhouse, accessory buildings and equipment. The city proposes to sell it for the total sum of $260,000, with a down payment of $23,000, the balance being payable in instalments, with interest at 5% per annum, over a 20 year period.

(b) The Hyde Park golf course is located outside (approximately 1¼ miles southwest) of the city limits at Hyde Park Road and Niblick Drive. It consists of approximately 133.74 acres of land purchased by the city, and is now a complete 18 hole golf course, with furnished clubhouse, accessory buildings and equipment. The city proposes to sell it (excepting .625 acres) for the total sum of $366,001, with a down payment of $25,001, the balance payable in instalments, with interest at 5% per annum, over a 20 year period.

(c) Prior to April 6, 1959, the city had operated both golf courses as public recreational facilities. On April 1, 1959, the United States district court enjoined the city from refusing to allow negroes to use the golf courses upon the same basis as white persons were permitted to use them. The effective date of the

injunction was April 7, 1959, and on April 2, 1959, the city commission "temporarily" closed the golf courses effective April 6, 1959. At the time, negro golfers were using both golf courses 1/7th of the time and the revenue derived from negro golfers amounted to 1/26th of the total revenue. The commissioner in charge was of the opinion that "integration" of the golf courses would cause such a decrease in revenue that the city would be forced to cease operation of them.

(d)   The golf courses remained closed, and on August 11, the city council (by ordinance, concurred in by the city commission) determined that they would no longer be operated, that they were surplus to the needs of the city, and should be offered for sale upon the express condition that the properties should be continually maintained and used only for golf courses. Under the plan, appraisals were to be secured and the properties advertised for sale. Easements and rights for utility and drainage purposes and for the municipal radio station were to be reserved. Appraisals were secured and the Brentwood course was valued at $496,000, and the Hyde Park course at $606,000. The values placed on the properties by the appraisers were strictly "golf course values", and the appraisals were made on the basis that the purchasers would be required to maintain and use the property as golf courses for a period of 10 years only.

(e)   Pursuant to the ordinance referred to in paragraph (d), the golf courses were advertised for sale in newspapers of general circulation, the advertisements stating that sealed bids would be received on September 22, 1959. The advertisement relating to the Brentwood course stated that no proposal for less than $496,000 would be considered, and the advertisement relating to the Hyde Park course stated that no proposal for less than $606,000 would be considered. No bid having been received on either course on or before September 22, 1959, the city commission determined to readvertise the properties for sale with the requirement for minimum bids eliminated. The properties were readvertised in a newspaper of general circulation, the advertisements stating that sealed bids would be received on October 6, 1959, and requiring the bidder to state the total purchase price to be paid and the terms of payment.

(f)   On October 6, 1959, the city commission received the bid of $260,000, referred to in paragraph (a) and also a bid of $193,000 for the Brentwood course. It received the bid of $366,001 referred to in paragraph (b) and also a bid of $306,050 for

the Hyde Park course. The low bids proposed even smaller down payments than did the high bids. On November 10th, 1959, the city commission accepted the bid of $260,000 which was made by Robert C. Lochner for the Brentwood course, and the bid of $366,001 which was made by D. C. Dawkins, Jr., for the Hyde Park course, and authorized and requested the city attorney to prepare and submit to the city council the necessary ordinance to provide for each of the proposed sales.

(g) Under the terms and conditions of the proposed sales, each deed is to contain the following — "This conveyance is made upon the express condition that the property hereby conveyed shall be continuously maintained by the Grantee, its (*his*) successors (*heirs*) and assigns, as a golf course and shall be used only for the purpose of a golf course; and if said property be not so maintained or should it be diverted to other use, said property shall immediately revert to the Grantor, its successors or assigns * * * ".

(h) Less than one-half of one percent of the citizens of Jacksonville use the golf courses; and during the last four full years (1955-1958) that they were operated, expenditures by the city on the golf courses exceeded revenue received from them by $250,089, so that over one-quarter million dollars of tax money was expended in the operation of the golf courses during the four year period.

### Provisions of City Charter

The pertinent provisions of the charter of the City of Jacksonville are section 6 and section 605, and they provide —

Sec. 6. Powers of city generally.

Said corporation shall have perpetual succession, shall sue and be sued, plead and be impleaded, may purchase, lease, receive and hold property, real and personal, within said city; and may sell, lease or otherwise dispose of the same for the benefit of the city; and may purchase, lease, receive and hold property, real and personal, beyond the limits of the city, to be used for the burial of the dead; for the erection of waterworks; for the establishment of poor-houses, pest houses, houses of detention and correction; for the public parks and promenades, and for any other public purposes that the Mayor-(commissioner) and City Council may deem necessary or proper; and may sell, lease or otherwise dispose of such property for the benefit of the city to the same extent as natural persons may. * * * . (Acts 1887, ch. 3775, art. 1, Sec. 2)

Sec. 605. Sale of real estate belonging to city—

Joint concurrence by Commission and Council.

That from and after the passage of this Act, no sale of real estate belonging to the City of Jacksonville shall be made without the joint concurrence of the City Council and the City Commission of said city. All deeds and other conveyances of such real estate shall be authorized by ordinance duly passed by the City Council and approved by the Mayor-(commissioner) and the City Commission of said city. (Acts 1943, ch. 22349, Sec. 1.)

Section 6 supplies the power to sell and section 605 prescribes the procedure in making sales of city property. According to the statement of the city attorney in open court, the ordinance required by section 605 will be submitted to the city council on November 24th, 1959.

### Opinion and Decision

In their brief and oral argument, the plaintiffs contend that the city may not sell the golf courses without special legislative authorization, and that it may not sell them for less than their appraised values as golf courses. They assert that the properties were purchased and are held for public purposes; that they are held in trust for the people, and that the proposed sales for less than appraised values constitute "a gift of public property to private individuals". Even though the plaintiffs concede that no question of denial of their constitutional rights is presented for decision, they argue that the golf courses were "closed to avoid an order" of the federal court which would have required "integration" as a condition to continued operation.

The court is not concerned with the reasons which may have prompted the elected officials of the city to close the golf courses. This is so because the operation by the city of luxury or other recreational facilities (even though declared by the legislature to be a public purpose) is not a governmental function, McQuillin, Municipal Corporations, vol. 18, page 466, and the city is not compelled to operate them. Being under no legislative mandate or other compulsion to operate the golf courses, the city had the right to close them. Griffis v. City of Fort Lauderdale (Fla.), 104 So. 2d 33; Tonkins v. City of Greensboro (U.S.D.C.), 162 F. Supp. 549.

In support of their contention that the city may not sell the golf courses in the absence of express legislative authorization, plaintiffs cite a number of decisions, including City of Daytona Beach v. Dygert, 146 Fla. 352, 1 So. 2d 170, and City of Clearwater v. Caldwell (Fla.), 75 So. 2d 765. Both cases involved *leases* of property being used for municipal purposes to private

individuals, and neither they nor the other authorities relied upon by the plaintiffs are authority for the proposition that the City of Jacksonville cannot *"sell and thus permanently dispose of"* the golf courses under the general powers contained in its charter. City of Clearwater v. Caldwell, supra; Griffis v. City of Fort Lauderdale (Fla.), 104 So. 2d 33; Bailey v. City of Tampa (Fla.), 111 So. 119; Cleary v. Dade County (Fla.), 37 So. 2d 248; American Jurisprudence, vol. 38, page 165, section 3487 on Municipal Corporations.

On the plaintiffs' proposition that the city may not sell the golf courses for less than the value placed thereon by the appraisers, the rule is that the courts should not interfere unless there is a showing of illegality, fraud or abuse of authority. Bailey v. City of Tampa (Fla.), 111 So. 119; McQuillin, Municipal Corporations (3rd Ed.), vol. 18, page 103; Rhyne, Municipal Law, (1957 Ed.), page 381. The fact that the city proposed to sell its golf courses has been widely publicized in newspapers of general circulation, and there has been no restriction as to the parties who might submit bids. As only two bids were received for each of the golf courses, it is obvious that there is little demand for and that few persons are willing to risk investments in property of this nature. If they were true bargains or, in effect, were being disposed of at "give-away prices", it is reasonable to suppose that the plaintiffs or other interested persons would have submitted additional bids.

In this connection, the evidence shows that as they were being operated by the city, the golf courses were a liability and a substantial burden on the taxpayers of the city, and that there was opposition by those using the courses to increase in the charges made by the city. In addition, the evidence clearly indicates that upon sales to private interests, substantial increase in the charges being made by the city at the time the courses were closed may be expected, because (1) *private owners must pay taxes on the properties,* and (2) *they will expect to receive a reasonable return on and eventually recoup their investments.*

Under these circumstances, the contentions of the plaintiffs that the properties should have been offered for sale without the restriction that they be used for golf courses and that they should not be sold for less than the appraised values of the lands alone are not illogical. However, these are arguments which must be addressed to the elected officials of the city, because it is not the province of the court to pass upon the wisdom or the folly of the proposed sales. On the contrary and as above indicated, the court must limit its consideration to the question of whether there has been a showing of illegality, fraud or abuse of authority. The

court may not substitute its judgment for the judgment of the elected officials, and thus play the role of the potter in shaping the decision of the city as to the advisability, terms and conditions of the proposed sales.

The above mentioned restrictions that the properties be *used only for golf courses* are not unlawful, and may be treated as a part of the consideration for the sales. Babb v. Green (S.C.), 73 S.E. 2d 699; Schatz v. City Council (N.D.), 61 N.W. 2d 423. And though the reverter clause will be valid for 21 years only, yet the restrictions do not terminate and may be enforced and violation thereof restrained by a court of competent jurisdiction upon the petition of any party adversely affected. Section 689.18, Florida Statutes.

There has been no suggestion of fraud or collusion in the proposed sales. The only suggestion of illegality is that the city does not have the power to sell in the absence of special legislative authorization, and the point has been decided contrary to the contentions of the plaintiffs. As to the asserted abuse of authority because of the inadequacy of the consideration in each of the proposed sales, the fact is that the city commission has accepted the highest and best bids made. In Griffis v. City of Fort Lauderdale (Fla.), 104 So. 2d 33, the record shows that the city procured an appraisal of approximately one million dollars on its golf course and sold it to the highest and best bidder for $362,400. In that case, both the trial court and the Supreme Court refused to interfere with the action of the city officials. On the basis of the Griffis decision and the evidence presented in this case, this court should not decide that the consideration for which the City of Jacksonville proposes to sell the Brentwood and Hyde Park golf courses is so inadequate as to show abuse of discretion.

Upon the facts found and the law as applied to facts, it is ordered, adjudged and decreed that —

The City of Jacksonville has ceased to operate public golf courses, and has declared the properties purchased by it and known as the Brentwood golf course and the Hyde Park golf course to be surplus to its needs.

Under its charter, the City of Jacksonville has the authority to sell surplus property to the highest and best bidder, and to restrict the use of property sold to any lawful use, and any such restriction will be valid and binding to the extent provided in section 689.18 (4) (7), Florida Statutes.

The injunctions sought should be, and the same are, hereby denied.